Scott Ferguson, Chair Crittenden County Election Commission Crittenden County Courthouse Marion, AR 72364
Dear Mr. Ferguson:
I am writing in response to your request for my opinion, pursuant to A.C.A. § 25-16-706(b), on various questions relating to the election of the next St. Francis Levee District Board of Directors, which you indicate is scheduled for November 2005. You report the following facts:
 Section 14-123-301(b) [sic: A.C.A. § 14-123-501(b)] of Act 1917 [sic: enacted pursuant to Act 117 of 1917] states that a district with four or more counties shall have at least one director per 100,000 acres of land and for a fraction more than 50,000 of land.
 Crittenden County has four St. Francis Levee District Directors and the Election Commission is charged with drawing boundaries. This has never been done in the past and the need to do so has arisen.
Against this backdrop, you have posed the following questions:
 1. How should the Election Commission determine where the St. Francis Levee Board District boundaries are drawn? More specifically, should the boundaries be drawn by (a) total acreage within the county; (b) population within the county; (c) by levee tax assessment values; or (d) at large?
 2. What are the eligibility requirements for district directors? More specifically, given the requirements of "section 9 of Act 1917" [sic: Act 117 of 1917] dealing with the election of directors:
 (a) Should a person running for Levee Director live within the boundary of the district for which he is running or may he just be a landowner within that district?
 (b) How much land must be owned by that person? Is the 40 acres of land requirement still in effect or has that been changed by the legislature?
 (c) If the person is a member of a corporation that owns land within that district, is he eligible to run?
 (d) If land is listed in the name if [sic] one person, may that person's spouse be eligible to run if the land is not also listed in their [sic] name? What if it is a child or grandchild who is not listed yet wishes to run?
 (e) If a person owns land in two counties covered by the district, is he eligible to run (i.e. a person lives in and owns twenty acres in Crittenden County and also owns 80 acres in Cross County, would that person be eligible to run in Crittenden County? Cross County?)
 (f) A person is the guardian for a person who owns 40 acres of land within the district. Would the guardian be eligible to run for a levee district director? (Section 14-123-301(b))
 (g) May non-resident bondholders be eligible to run? (Section 14-123-302)
 (h) Must land be owned debt free or may there be a mortgage on the land? May there be a second mortgage on the land?
 3. Who is eligible to vote in the St. Francis Levee District election? More specifically:
 (a) How much land must a person own in order to vote in the St. Francis Levee District election?
 (b) If land is listed in the names of a husband and wife, do both persons vote or only one? If it is only one, how is it determined which one may cast the vote?
 (c) If a person owns land in two counties, may they [sic] vote in both counties or only the county within which they reside?
 (d) Can a person vote if he leases the land? If this person does not pay the levee taxes but is in the area covered by the levee district, may that person vote?
 (e) If a corporation owns land within the district, may the corporation vote and, if so, how is it determined who casts that vote?
 (f) If the landowner's primary residence is out of the state or district, may he vote?
 (g) Who are "non-resident bondholders" and how are they identified? How do you practically identify non-resident bondholders who are eligible to vote according to Section 14-123-302?
(h) Are only people who pay levee district taxes eligible to vote?
 (i) Is the legal guardian of a person who owns land within the district eligible to vote in the election? (Section 14-123-301(b))
 (j) Do the levee voting rules render this election procedure unconstitutional according to State and Federal election laws?
 (k) Some land in Crittenden County is not in the St. Francis Levee District; can only deeded landowners within the district vote?
 (l) If 20 people are listed as owning one piece of property within the Levee District, can all 20 people vote?
RESPONSE
Question 1: How should the Election Commission determine where the St.Francis Levee Board District boundaries are drawn? More specifically,should the boundaries be drawn by (a) total acreage within the county;(b) population within the county; (c) by levee tax assessment values; or(d) at large?
I do not believe the Election Commission is authorized to "draw boundaries" for the election of directors. Moreover, although the pertinent legislation invites clarification, I believe the directors should be elected at large.
I must initially question your suggestion that "the Election Commission is charged with drawing boundaries." The legislature has drawn the boundaries of the district as a whole. See Act 19 of 1893. I assume by "drawing boundaries" you mean mapping out geographical areas within the portion of the St. Francis Levee District lying within Crittenden County into parcels of 100,000 acres, or, with respect to remaining acreage, possibly a fraction thereof, in order to elect a director from each such parcel. See A.C.A. § 14-123-501 (Repl. 1998). You do not indicate, and I am unaware of, any authority for the proposition that the Election Commission has been or may be charged with this duty. Moreover, the Election Commission's suggestion that it is obliged to "draw boundaries" would appear to rule out the "at large" election alternative you list as option (d) in your question, since an at-large election would obviate the need for any intra-district drawing of boundaries.
As your factual recitation suggests, the St. Francis Levee District comprises more than four Arkansas counties, thus triggering the application of A.C.A. § 14-123-501, which provides in pertinent part:
 (a)(1) The board of directors of any levee district embracing lands in four (4) or more counties shall consist of one (1) director for every one hundred thousand (100,000) acres, and for a fraction or more than fifty thousand (50,000) acres, of lands on which taxes are assessed by the district in each of the respective counties. However, any county which has more than one hundred thousand (100,000) acres and less than one hundred fifty thousand (150,000) acres embraced in any levee district, subject to a levee tax, shall have two (2) levee directors.
* * *
 [b](2) On the first Monday in November 1933 and every (4) years thereafter, one (1) director shall be elected from each county or division, as the case may be, in the manner provided by law, who shall serve for a term of four (4) years and until his successor is elected and qualified.
* * *
 (c) Any resident of a county whose lands are embraced in any levee district and is otherwise eligible to serve as a levee director shall not be required to reside in the land embraced in the levee district division of the county.
The legislature enacted this statute pursuant to Act 75 of 1929, as amended by Act 968 of 1981. Given its date of enactment, the provisions of this statute supersede any contradictory provisions ofAct 117 of 1917, which deals specifically with the election of St. Francis Levee District directors.
As reflected in the above excerpt, A.C.A. § 14-123-501(a)(1) provides for the election of one director "for every one hundred thousand (100,000) acres, and for a fraction or more than fifty thousand (50,000) acres, of lands on which taxes are assessed by the district in each of the respective counties." At issue, it seems to me, is whether this statute merely provides a formula for determining the number of directors to be elected at large from any given county or whether it directs that the portion of the district within any given county be divided by acreage into divisions, with the voters electing one director from each such division and, possibly, from any remaining area comprising more than 50,000 acres.
In addressing this issue, I must consider the terms of A.C.A. §14-123-501(c), which provides that any county resident may serve as a director if he is "otherwise eligible to serve" and he owns property "embraced in the levee district division of the county." (Emphasis added.) The highlighted term might be read as suggesting that the legislature indeed intended to require the demarcation of divisions within those portions of the county contained within the district, limiting eligibility to represent any given district to county residents who own property within the district. Subsection (b)(2) of the statute might be read as confirming this interpretation, providing that candidates will be elected "from each county or division, as the case may be, in the manner provided by law." (Emphasis added.) The highlighted language could be read as accommodating the alternative possibilities that the district acreage in any given county warrants only the election of one director, in which case the director would represent the county, or that the district acreage is sufficiently great to warrant the formation of divisions, each of which would provide one qualified director.
However, on reflection, I do not believe the construction I have just set forth is appropriate. The highlighted references to a "division" of the county could as readily be interpreted as referring only to whatever portion of the county happens to lie within the levee district. Moreover, neither A.C.A. § 14-123-501 nor any other pertinent legislation even remotely suggests that voter eligibility turns on some affiliation with a "division" of the acreage within the county comprising a portion of the district. Subchapter 5 of chapter 123 of title 14 of the Code, which deals generally with levee districts embracing four or more counties, does not address the issue of who is eligible to vote for directors. However, common sense would suggest that if a director were required to be associated in some particular way with a "division" of county acreage contained within a district, be it by residence or the ownership of property, the voters who elect that director would likewise be required to have some specific affiliation with the "division." I find it significant that no such restriction on voter eligibility applies.
Section 7 of Act 117 of 1917, which I believe continues to apply in the absence of subsequent inconsistent legislation, provides:
 For the purpose of electing directors for the St. Francis Levee district, as herein provided for, the following shall be entitled to vote and no others:
 All residents of the county owning real estate in the St. Francis Levee district shall be entitled to one vote each in the county of his residence.
This legislation clearly does not contemplate any voting by "division." Moreover, neither A.C.A. § 14-123-501, Act 19 of 1893, which created the St. Francis Levee District, Act 100 of 1893, whereby the state donated various lands to the district, Act 117 of 1917, which addressed the procedures for electing the directors of the St. Francis Levee District, nor any other pertinent legislation even addresses the question of who might be charged with the duty to establish such "divisions" — a fact that suggests that the legislature intended A.C.A. § 14-123-501 only to provide a formula for determining the number of directors allotted to any given county, not to mandate the formation of divisions within county acreage contained within a levee district. Accordingly, although the matter is far from clear, I believe the levee district directors should be elected at large.
Question 2: What are the eligibility requirements for district directors?More specifically, given the requirements of "section 9 of Act 1917"[sic: Act 117 of 1917] dealing with the election of directors:
 (a) Should a person running for Levee Director live within the boundary of the district for which he is running or may he just be a landowner within that district?
In my opinion, a candidate for director need not live within the boundary of the levee district. However, he must live within the county in which he is running that contains part of the district and he must further have owned for at least one year preceding the election at least forty taxable acres of property within the district.
Section 9 of Act 117 of 1917 provides:
 Any person shall be elegible [sic] to be elected and to serve as a director of the St. Francis Levee district, who at the time of the election and for at least one year past before such election shall be and shall have been the owner of not less than forty acres of land within the said district and subject to its levee tax, and within the county for which he is a candidate, and who at the time of such election is a citizen and resident of the county for which he is a candidate.
The question arises whether this legislation is consistent with A.C.A. §14-123-501, which was subsequently enacted as Act 75 of 1929. Subsections (b)(2) and (c) of this statute provide:
 [b](2) On the first Monday in November 1933 and every (4) years thereafter, one (1) director shall be elected from each county or division, as the case may be, in the manner provided by law, who shall serve for a term of four (4) years and until his successor is elected and qualified.
 (c) Any resident of a county whose lands are embraced in any levee district and is otherwise eligible to serve as a levee director shall not be required to reside in the land embraced in the levee district division of the county.
(Emphasis added.) In my opinion, this statute requires only that the director own property within the district and that he meet any other eligibility requirements. This statute thus appears consistent with section 9 of Act 117 of 1917, which merely states additional requirements such as residency in the county and ownership of at least forty taxable acres of property within the district. Accordingly, I believe the eligibility requirements set forth in Act 117 still apply.
 (b) How much land must be owned by that person? Is the 40 acres of land requirement still in effect or has that been changed by the legislature?
As reflected in my response to your previous question, I believe A.C.A. § 14-123-501 merely acknowledges the requirement that a candidate for director own property in the district. I do not believe this statute qualifies the applicability of section 9 of Act 177 of 1917, which provides that a candidate must own at least forty acres of taxable property within the district. In my opinion, this requirement still applies.
I should note that A.C.A. § 14-123-301(b), which was enacted pursuant toAct 78 of 1879, more broadly provides that "landowners of the district and mortgagees after condition broken shall . . . be eligible to election" as directors. Although this statute imposes no minimum-ownership requirement, I do not believe it applies to the St. Francis Levee District. As subsequent legislation, Act 117 of 1917 would control over Act 78 of 1879 even if the latter were deemed to have once applied to the district. Moreover, as reflected in A.C.A. §14-123-301(a), the provision just quoted applies only to districts that have been created by action of the county court, not to districts created by local legislation such as Act 19 of 1893, which created the St. Francis Levee District.[1] Accordingly, I believe the provisions ofAct 117 of 1917 continue to apply.
 (c) If the person is a member of a corporation that owns land within that district, is he eligible to run?
In my opinion, "no."
Subsection 9 of Act 117 of 1917 provides that "any person" who meets the residency and ownership requirements set forth therein will be eligible to serve as a district director. I do not read this language as including a representative of a corporation that owns property within the district. I am bolstered in this conclusion by the fact that Act 117 expressly identifies "corporations, firms and partnerships" as eligible to vote for directors so long as they have "members residing in the county in which the land is situated." The legislation provides no guidance as to whether the term "members" refers to shareholders or employees. Whatever the appropriate interpretation, if the legislature had likewise intended to allow individuals somehow affiliated with corporate landholders to serve as directors, I believe it would have specifically indicated as much.
 (d) If land is listed is [sic] the name if [sic] one person, may that person's spouse be eligible to run if the land is not also listed in their [sic] name? What if it is a child or grandchild who is not listed yet wishes to run?
I believe the answer to both of these questions is "no." Nothing in section 9 of Act 117 of 1917 suggests that anyone other than the record owner for at least a year of at least forty taxable acres within the district may run to serve as a levee director, and only then if he resides within the county in which he is running.
 (e) If a person owns land in two counties covered by the district, is he eligible to run (i.e. a person lives in and owns twenty acres in Crittenden County and also owns 80 acres in Cross County, would that person be eligible to run in Crittenden County? Cross County?)
As noted above, section 9 of Act 117 of 1917 mandates that a candidate for director own at least forty taxable acres of property within the district and reside within the county in which he is running. With respect to your hypothetical, so long as the individual had owned for more than a year forty acres of taxable property within the district, he could run in the county, and only in the county, in which he resides. Assuming, then, that an individual resident of Crittenden County owned twenty acres of property there and eighty acres in Cross County, all of which lay within district boundaries, he would be eligible to run for director only in Crittenden County.
 (f) A person is the guardian for a person who owns 40 acres of land within the district. Would the guardian be eligible to run for a levee district director? (Section 14-123-301(b))
In my opinion, "no."
Section 14-123-301(b) of the Code provides in pertinent part that "guardians duly appointed, and who shall have given bond and received letters of guardianship of infant heirs or insane persons owning land in the district, may vote in right of their respective wards." However, as noted above, subsection (a) of this statute defines the election as being one conducted following a county court's formation of a district pursuant to A.C.A. § 14-123-201. I do not believe these statutes apply to the St. Francis Levee District, which was formed by direct legislative action inAct 19 of 1893 and whose election requirements are set forth inAct 117 of 1917. Nothing in section 9 of Act 117, which sets forth the eligibility requirements for directors, supports the conclusion that a landowner's guardian may serve as a levee director.
 (g) May non-resident bondholders be eligible to run? (Section 14-123-302)
Section 14-123-302 of the Code provides:
 Nonresident bondholders, as well as resident landowners, shall be allowed to vote at such elections and also have a vote in determining when work shall be done, as prescribed in § 14-123-301, and the nonresident bondholders may cast their votes either by themselves or by their agents or attorney in fact, duly appointed.
(Emphasis added.) The highlighted language refers to the elections authorized by A.C.A. § 14-123-301(a) — i.e., elections called by the county court following its establishment of a levee district pursuant to A.C.A. § 14-123-201. As previously discussed, I do not believe these election procedures apply to the St. Francis Levee District, whose voting procedures and eligibility requirements are set forth in Act 117 of 1917.
Moreover, the statute you have recited deals only with eligibility to vote for directors, not with eligibility to serve in that capacity. Nothing in subchapter 3 of chapter 123 of title 14 of the Code authorizes a nonresident bondholder to serve as the director of a levee district established by the county court.
 (h) Must land be owned debt free or may there be a mortgage on the land? May there be a second mortgage on the land?
In my opinion, although the law is not entirely clear on this matter, the fact that property is subject to a first or a second mortgage would not render its owner ineligible to serve as a levee director.
As previously noted, subject to various conditions not pertinent here, the "owner" of sufficient property within the district will be eligible to serve as a levee director. At issue, then, is whether a mortgagor of property might accurately be termed the "owner" of the mortgaged property.
In my opinion, under Arkansas law, a mortgagor maintains at least an equitable ownership interest in his property, thus qualifying him to serve as a director under section 9 of Act 117 of 1917. In Bank of OakGrove v. Wilmot State Bank, 279 Ark. 107, 110, 648 S.W.2d 802 (1983), the Arkansas Supreme Court offered the following analysis of the respective property interests held by a mortgagor and a mortgagee:
 While recognizing that parties to a mortgage have duality of interest in mortgaged lands, our decisions suggest that a legal title does, indeed, pass from the mortgagor to the mortgagee, the former retaining only an equitable interest, conditioned on payment of the indebtedness. Harris v. Collins, 202 Ark. 445, 150 S.W.2d 749 (1941); Morgan Utilities, Inc. v. Kansas City Life Insurance Co., 183 Ark. 492, 37 S.W.2d 90 (1931); Fitzgerald v. Chicago Mill and Lumber Co., 176 Ark. 64, 3 S.W.2d 30 (1928). Dr. Leflar evidently regards mortgages as resulting in a transfer of title:
 "The giving of a mortgage on land is a transfer of a title interest in the land, and the security interest given by a mortgage is a fee simple or lesser estate, usually, corresponding to the estate owned by the mortgagor.
 See Leflar, American Conflicts Law, 3rd Edition, 171, P. 442.
Under this principle, although a mortgagor has something less than a fee simple absolute interest in his property, he at the very least has an equitable ownership interest therein. See, e.g., Nelson v. Nelson,267 Ark. 353, 358, 590 S.W.2d 293 (1979) (holding that even if a loan were secured by the conditional conveyance of a deed, as opposed to a mortgage, the deed would constitute only an "equitable mortgage" and ownership would remain in the mortgagor).
Section 9 of Act 117 of 1917 does not specify precisely what the term "ownership" denotes. I appreciate that the supreme court's tentative endorsement of a "title theory" of mortgages, whereby a mortgage is conceived as conveying an actual fee simple interest to the mortgagee, might be construed as meaning that the mortgagor no longer "owns" the property. However, as reflected in Nelson, the court has acknowledged what common sense suggests — namely, that a mortgagee's interest in the property is merely conditional, not absolute, and that subject to the fulfillment of his obligations, the mortgagor retains a possessory interest in property that clearly warrants designating him at least the "equitable owner" of the property. I sense nothing in section 9 ofAct 117 of 1917 to suggest that the resident owner of an equitable possessory interest in property should be foreclosed from serving as a levee district director. I am confirmed in this conclusion by the following parallel provision relating to the eligibility of candidates for directorships in districts formed by the county court: "[M]ortgagees in possession after condition broken shall . . . be eligible to election" to the position of director. A.C.A. § 14-123-301(b). This provision suggests that the legislature will consider a mortgagor the "owner" of his property until he violates the conditions of his mortgage and loses his possessory interest. Although section 9 of Act 117 of 1917 does not expressly state as much, I believe the same conclusion applies to the owners of property located within the St. Francis Levee District.
Question 3: Who is eligible to vote in the St. Francis Levee Districtelection? More specifically:
 (a) How much land must a person own in order to vote in the St. Francis Levee District election?
Section 7 of Act 117 of 1917 provides in pertinent part: "All residents of the county owning real estate in the St. Francis Levee district shall be entitled to one vote each in the county of his residence." Unlike section 9, which requires ownership of at least forty taxable acres within the district to qualify as a director, section 7 imposes no minimum ownership interest on property owned within the district in order to qualify to vote. Section 7, unlike section 9, further does not require that the property owned be subject to district taxation. Accordingly, I believe any county resident who owns property within the district is eligible to vote for directors.
 (b) If land is listed in the names of a husband and wife, do both persons vote or only one? If it is only one, how is it determined which one may cast the vote?
In my opinion, both are entitled to vote.
As reflected in my response to your previous question, section 7 of Act 117 imposes no minimum land-ownership requirement in order to qualify to vote in St. Francis Levee District elections. In my opinion, then, each of the record owners of a piece of property should be allowed to vote, regardless of whether the multiple owners of a fee interest share ownership as tenants by the entirety, as a husband and wife generally do, as joint tenants or as tenants in common.
 (c) If a person owns land in two counties, may they [sic] vote in both counties or only the county within which they reside?
Section 7 of Act 117 of 1917 states two conditions for eligibility to vote: (1) ownership of property within the district; and (2) residence within the county in which one is voting. Accordingly, a person owning land in two counties within the district may vote only in the county in which he resides.
 (d) Can a person vote if he leases the land? If this person does not pay the levee taxes but is in the area covered by the levee district, may that person vote?
In my opinion, the answer to both of these questions is "no."
Section 7 of Act 117 of 1917 is unequivocal in declaring that only individuals "owning" property within the district are eligible to vote in an election for directors. A leasehold interest in property is not a fee interest of the sort held by an "owner" of property. Accordingly, I believe only the lessor of property located within the district may vote, and only then if he resides within the county in which he is voting.
 (e) If a corporation owns land within the district, may the corporation vote and, if so, how is it determined who casts that vote?
Act 117 of 1917 is unclear on this question. Section 1 of Act 117 provides:
 The members of the board of directors of the St. Francis Levee district shall be chosen and elected by vote of the residents within the county owning real estate within said district, and corporations, firms and partnerships owning land in the district and having members residing in the county in which the land is situated, as hereinbefore provided.
(Emphasis added.) Although this passage considered in isolation clearly appears to afford qualified corporations a right to vote, it is unclear regarding precisely what those qualifications are. For instance, I am uncertain whether the highlighted phrase "members residing in the county" refers to resident employees or resident shareholders of the corporation. Also, the statute is silent on the question of which of the resident "members" would qualify to cast what I assume would be the single vote to which the corporation would be entitled.
Further complicating matters is the fact that section 7 of Act 117, which directly addresses the issue of voting eligibility, provides as follows:
 For the purpose of electing directors for the St. Francis Levee district, as herein provided for, the following shall be entitled to vote and no others:
 All residents of the county owning real estate in the St. Francis Levee district shall be entitled to one vote each in the county of his [sic] residence.
(Emphasis added.) In my opinion, the highlighted limitation on eligibility, read in conjunction with the term "his" in this passage, suggests a legislative intention to limit voter eligibility to otherwise qualifying natural persons, not to corporations. I am unable to resolve this apparent contradiction.
 (f) If the landowner's primary residence is out of the state or district, may he vote?
In my opinion, "no." Section 7 of Act 117 of 1917 is unambiguous in dictating that only qualifying "residents of the county" may vote.
 (g) Who are "non-resident bondholders" and how are they identified? How do you practically identify non-resident bondholders who are eligible to vote according to Section 14-123-302?
As discussed in my response to question 2(f) and (g), supra, I believe A.C.A. § 14-123-302 applies only to elections in levee districts formed by the county court, not to elections conducted pursuant toAct 117 of 1917 in the St. Francis Levee District. Your first question is consequently moot, and your second question is based on a mistaken assumption of law. Section 7 of Act 117 of 1917 does not authorize nonresident bondholders to vote in district elections.
(h) Are only people who pay levee district taxes eligible to vote?
Section 7 of Act 117 of 1917 specifies only that all county residents who own real estate in the district are eligible to vote. The legislation contains no restriction requiring that the real estate be taxed as a condition of eligibility. Compare section 9 of Act 117 (conditioning eligibility to serve as a director on ownership for at least one year of at least forty acres "subject to . . . levee tax" within the district). Assuming, then, that the district contains property that is not subject to taxation — a factual assumption I am unable to test — the owner(s) of such property will be entitled to vote so long as they reside in the county.
 (i) Is the legal guardian of a person who owns land within the district eligible to vote in the election? (Section 14-123-301(b))
In my opinion, "no." I do not believe a guardian is automatically authorized by operation of law to exercise his ward's voting rights. This principle is illustrated in A.C.A. § 14-123-301(b), which expressly provides in pertinent part that in levee districts organized by the county court "guardians duly appointed, and who shall have given bond and received letters of guardianship of infant heirs or insane persons owning land in the district, may vote in right of their respective wards." However, as previously noted, this statute does not apply to the St. Francis Levee District. No parallel provision in Act 117 of 1917 affords guardians such voting rights in the St. Francis Levee District.
 (j) Do the levee voting rules render this election procedure unconstitutional according to State and Federal elections laws?
I assume that by "levee voting rules" you mean the restrictions set forth in Act 117 of 1917. As previously noted, Act 117 restricts voting to residents of the county who own property within the district.
Your question may reflect some concern that only county residents who own property within the district may vote and that only county residents who own, and have owned for at least a year, forty acres or more of taxable property within the district may serve as directors. You may further be troubled that the rules with respect to voting in the St. Francis Levee District are somewhat more restrictive than those that apply in districts formed by the county court — not expressly authorizing, for instance, proxy voting by guardians. A question might further arise concerning the fact that nonresidents of the county who own property in the district are disenfranchised under Act 117. In addition, one might question why Act 117 does not weight voting power to reflect disparities in acreage owned and tax value assessed. A critic might also question whether Act 117's possible disenfranchisement of corporate owners of property in the district can pass constitutional muster. Finally, the question arises whether the legislature could permissibly authorize nonresident bondholders to vote in elections in districts formed under the general legislation relating to districts formed by decree of the county court while denying nonresident bondholders a vote in the St. Francis Levee District, which was formed by legislation applicable only to it.
You mention in your question both the election laws, by which I assume you mean statutory law, and the constitutional ramifications of the above classifications. With respect to the former, I believe that Act 117 might in theory implicate the Voting Rights Act of 1965, 42 U.S.C. § 1971 etseq. Specifically, 42 U.S.C. § 1973 provides:
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title,[2] as provided in subsection (b) of this section.
 (b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
The question initially arises whether a levee district qualifies as a "political subdivision" of the state for purposes of applying this statute. Although I have found no case law in either this or any other jurisdiction directly addressing this point, a federal circuit court has answered this question in the affirmative with respect to what I consider a closely analogous agricultural improvement and power district. In Smithv. Salter River Project Agricultural Improvement and Power District,109 F.3d 586, the Ninth Circuit Court of Appeals offered the following analysis:
 Fifteen years ago, the District's voting system was the subject of a Fourteenth Amendment challenge. In Ball v. James, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981), the Supreme Court held that the District was not subject to the Equal Protection Clause's one-person, one-vote requirement. The Court explained that "though the state legislature has allowed water districts to become nominal public entities in order to obtain inexpensive bond financing, the districts remain essentially business enterprises, created by and chiefly benefiting a specific group of landowners." Id. at 368, 101 S.Ct. at 1819 (citations omitted).
* * *
 Congress enacted the Voting Rights Act, 42 U.S.C. §§ 1971-1974e, to implement the Fifteenth Amendment and" rid the country of racial discrimination in voting." South Carolina v. Katzenbach, 383 U.S. 301, 315, 86 S.Ct. 803, 812, 15 L.Ed.2d 769 (1966). Section 2, as amended in 1982, prohibits the use by "any State or political subdivision" of any voting qualification, prerequisite to voting, or standard "in a manner which results in a denial or abridgment of the right . . . to vote on account of race or color." 42 U.S.C. § 1973(a). . . .
 The District argues that it is not a "political subdivision" within the meaning of § 2. While the language of § 2 does not expressly indicate its scope, the District's argument is inconsistent with the legislative history and judicial interpretations of § 2. The Supreme Court first interpreted the term "political subdivision" in the context of § 5, which deals with preclearance of election procedures.[3] United States v. Sheffield Bd. of Comm'rs, 435 U.S. 110, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978). The Court noted that § 14 of the Act, 42 U.S.C. § 1973 1 (c)(2), defines" political subdivision" to mean "any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting," but rejected the notion that § 14 limits the scope of § 5. Sheffield, 435 U.S. at 126, 98 S.Ct. at 976. Instead, the Court explained, "[t]he language, structure, history, and purposes of the Act persuade us that § 5, like the constitutional provisions it is designed to implement, applies to all entities having power over any aspect of the electoral process within designated jurisdictions." Id. at 118, 98 S.Ct. at 972. The Court found that a broad reading of § 5 was required to implement fully the Congressional objectives underlying the Act. Id. at 117-18, 98 S.Ct. at 971-72. The Court therefore held that § 5 applied to an Alabama city that did not register voters. Id. at 138, 98 S.Ct. at 982-83.
109 F.3d at 591-93. The court went on to review the legislative history of the Voting Rights Act, concluding that the term "political subdivision" in 42 U.S.C. § 1973 should likewise be given a broad reading. The court concluded that "the District is a political subdivision within the scope of § 2, whose electoral system may not abridge the rights of its electors to vote on account of their race or color." Id. at 594. Compare City of Combes, Texas v. East Rio Hondo WaterSupply Company, 244 F. Supp.2d 778, 783 (S.D. Tex 2003) (holding that a water supply corporation that has the power of eminent domain but lacks the power to assess taxes within its boundaries or to issue tax-exempt bonds does not qualify as a "political subdivision" subject to the Voting Rights Act), judgment affirmed by City of Combes, Tex. v. East Rio HondoWater Supply Corp., ___ U.S. ___, 123 S.Ct. 2651 (2003).
Given that the St. Francis Levee District has been afforded not only the power of eminent domain, but further the power to levy assessments on district members and to issue bonds, I believe a reviewing court would almost certainly designate it a "political subdivision" subject to the terms of the Voting Rights Act. A reviewing court would apply the following standard in determining whether the voting rules in the St. Francis Levee District offend the Voting Rights Act:
 As amended in 1982, § 2 prohibits voting qualifications which result in discrimination on account of race or color. Section 2 requires proof only of a discriminatory result, not of discriminatory intent. See Chisom, 501 U.S. at 394, 111 S.Ct. at 2263 ("[P]laintiffs can prevail under § 2 by demonstrating that a challenged election practice has resulted in the denial or abridgment of the right to vote based on color or race."). Section 2(b) guides the courts in applying the "results test," providing that "a violation of [§ 2] is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected] class of citizens." 42 U.S.C. § 1973(b).
1109 F.3d at 594 (footnotes omitted; italics and brackets in original). After reviewing the applicable case law, the court concluded:
 [A] bare statistical showing of disproportionate impact on a racial minority does not satisfy the § 2 "results" inquiry. Instead, "[s]ection 2 plaintiffs must show a causal connection between the challenged voting practice and [a] prohibited discriminatory result." Ortiz, 28 F.3d at 312. Only a voting practice that results in discrimination gives rise to § 2 liability.
Id. at 595 (emphasis and brackets in original). In a footnote to this passage, the court cited with approval a concurrence in Solomon v. LibertyCounty, Florida, 899 F.2d 1012 (11th Cir. 1990) stating the standard as being (1) whether the voting scheme allows racial bias to be expressed and (2) whether racial bias exists in the voting community. Id. at 595 n. 7.
In Smith, the court applied these principles to support its conclusion that a requirement of land ownership in order to vote in elections within an agricultural improvement and power district did not offend § 2, notwithstanding the fact that only 40% of African-American heads of household within the district owned homes, compared with 60% of white heads of household. Id. at 596. In reaching this conclusion, the court approved and applied the following "typical factors" identified by the Senate Judiciary Committee as pertinent to a "results" analysis in its report on the 1982 amendments to the Voting Rights Act:
 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
 6. whether political campaigns have been characterized by overt or subtle racial appeals;
 7. the extent to which members of the minority group have been elected to public office in the jurisdiction;
Additional factors . . . are:
 whether there is a significant lack of responsiveness on the part of elected officials to the particularized need of the members of the minority group;
 whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.
109 F.3d at 594 n. 6, quoting S.Rep. No. 97-417, 97th Cong., 2d Sess. (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206-07. Given the intensely factual nature of these inquiries, I am unable to predict what conclusions a court might draw regarding the legality under the Voting Rights Act of the voting procedures in effect in the St. Francis Levee District.
From a constitutional perspective, the statutory restrictions set forth in Act 117 of 1917 implicate the equal protection guarantees set forth in U.S. Const. amend. 14 and Ark. Const. art. 2, §§ 2 and 3. In Ark. Op. Att'y Gen. 99-446, my predecessor set forth the elements of an equal protection challenge as follows:
 The equal protection doctrine prohibits certain types of "classifications" that result in the disparate treatment of those who are similarly situated. However, classifications in and of themselves do not violate the equal protection doctrine. In order to establish an equal protection violation arising out of a classification that does not affect a suspect class or a fundamental right, it is necessary to show that the disparity is arbitrary — that is, that the disparity has no conceivable rational basis or rational relation to a legitimate end. Vacco v. Quill, 521 U.S. 793 (1997); Romer v. Evans, 517 U.S. 620, 631 (1996); Clements v. Fashing, 457 U.S. 957 (1982); Craft v. City of Fort Smith, 335 Ark. 417, 984 S.W.2d 22 (1998); Medlock v. Leathers, 311 Ark. 175, 842 S.W.2d 428 (1992), reh. denied, 1993; McCambridge v. City of Little Rock, 298 Ark. 219, 766 S.W.2d 909
(1989); Streight v. Ragland, 280 Ark. 206, 655 S.W.2d 459 (1983); City of Piggott v. Woodard, 261 Ark. 406, 549 S.W.2d 278 (1977).
 In reviewing the constitutionality of a classification that does not affect a suspect class or a fundamental right, the courts must not only presume the constitutionality of the challenged classification, but they must also uphold the classification even without requiring a showing of an actual rational basis, so long as any conceivable rational basis for the scheme can be adduced — even a hypothetical one. Ester v. National Home Ctrs., Inc., 335 Ark. 356, 981 S.W.2d 91(1998); Reed v. Glover, 319 Ark. 16, 889 S.W.2d 729 (1994); Arkansas Hospital Assoc. v. State Board of Pharmacy, 297 Ark. 454, 763 S.W.2d 73
(1989).
In my opinion, a court applying this "rational-basis" standard of constitutional review would in all likelihood uphold the various provisions of Act 117 discussed above. I see no constitutional problem, for instance, arising from the fact that Act 117 allows the vote only to residents of the county who own property. In Ark. Op. Att'y Gen. No.2003-200, which addressed the constitutionality of a law that would prohibit Level 3 and 4 sex offenders from living within 2,000 feet of a school or daycare unless they owned their residence within this area, I offered the following analysis of classifications based upon ownership of property:
 The Court has upheld some of the statutory classifications, see Quinn v. Millsap, 491 U.S. 95 (1989); Turner v. Fouche, 396 U.S. 346 (1970); Chappelle v. Greater Baton Rouge Airport Dist., 431 U.S. 159 (1977), and has stricken down others, see Ball v. James, 451 U.S. 355 (1981); Salyer Land Co. v. Tulare Lake Basin Water Storage Dist., 410 U.S. 719
(1973); Associated Enterprises, Inc. v. Toltec Watershed Improvement Dist., 410 U.S. 743 (1973). . . .
 Quinn, supra, involved a provision of the Missouri Constitution under which the governments of the city of St. Louis and St. Louis County could be reorganized by a vote of the electorate upon a plan of reorganization drafted by a "board of freeholders." This requirement of property ownership for membership on the board was challenged on equal protection grounds. The Court found that the task of the "board of freeholders" to reorganize city and county governments was not linked with land ownership, and the state failed to suggest any defensible purpose for the property ownership requirement. The Court thus held the requirement to be unconstitutional.
 For similar reasons, the Court held in Turner, supra, that a requirement that local school board members own property was not rationally related to any legitimate state interest. The Court pointed out that the state could not assume that a lack of property ownership indicated a lack of qualification to serve on the school board. The Court subsequently applied Turner, supra, to strike down a property ownership requirement for membership on a local airport commission.
 In contrast, the Court concluded in Ball, Salyer, and Toltec, supra,
all of which were water district cases, that a property ownership requirement for membership on the water district boards in question was rationally related to the purpose of those boards; the water delivered by those districts was distributed according to land ownership. In Ball, the Court emphasized "the peculiarly narrow function of [the] local government body" and its "special relationship" to the class of landowners. Ball, supra, at 357.
Based on the reasoning set forth in Ball, Salyer, and Toltec, supra, I believe a reviewing court would approve the voting classification based upon land ownership in the St. Francis Levee District. I offer this conclusion because there is a clear and direct relationship between land ownership in the district and control over the maintenance of that land as a levee district.
I likewise see no constitutional difficulty arising from the fact that Act 117 denies voting rights to owners of property within the district who do no live within the county. I believe the legislature may rationally have concluded that the interests of nonresident owners of property located within the district are too remote to warrant extending them the right to vote for directors.
Moreover, I do not consider it constitutionally impermissible for the legislature to have afforded each county-resident property owner only a single vote in elections, without regard for the extent of the property owner's landholdings in the district or the tax assessment value of his property. As a matter of policy, the legislature may have determined that affording each qualified property owner an equal vote would promote harmony in the district and avoid domination of the district's affairs by its largest landholders or those holding the most valuable property.
Furthermore, I do not believe either the state or the federal constitution would prohibit the legislature from denying corporate landowners the right to vote in elections for directors, if that is indeed what Act 117 might be read as doing. I am unaware of any other context in which a corporation, as distinct from its individual qualifying shareholders, may vote in an election relating to governmental or quasi-governmental affairs. The legislature may simply have concluded that levee district affairs would be most effectively run by those individuals who have the clearest and most immediate stake in the outcome — i.e., county residents who own property within the district. In my opinion, this reasoning would prove sufficient to withstand a rational-basis challenge.
Furthermore, I see no constitutional problem arising from the fact that nonresidential bondholders are entitled to vote in districts formed by action of the county court while they are not entitled to vote in the St. Francis Levee District. In drawing this distinction, the legislature may have concluded that the large St. Francis Levee District could successfully market bonds without vesting partial control over district operations in the bondholders, whereas marketing bonds in smaller county districts could succeed at comparable levels only if the bondholders were afforded some measure of control over the district's operations. Alternatively, the legislature may have reasoned that the crucial economic importance of the St. Francis Levee, which controls flooding along extensive stretches of the Mississippi River, warranted limiting control of its operations to owners of property within the district who also reside in the various counties that embrace the district.
Although the issue strikes me as somewhat more difficult, I believe a similar argument might serve to justify the legislature's allowing certain guardians to vote on behalf of their wards in districts created by county-court decree while denying such voting rights to the guardians of similarly situated wards in the St. Francis Levee District. Again, for the reasons set forth above, the legislature may have concluded that the St. Francis Levee District is of such unique importance that its affairs should ultimately be controlled only by legally competent county residents who own property within the district. The legislature may have concluded that allowing a qualifying resident to vote through a proxy whose interest in and proximity to the district are unknown would potentially jeopardize district operations. Stated differently, the legislature may have determined (1) that the interest of a guardian in the conduct of levee district affairs is simply not as direct as that of a county resident owning property in the district and (2) that for reasons of policy that may not apply in smaller districts, the St. Francis District should be run only by individuals having a clear and direct stake in its operations. Compare section 9 of Act 117 of 1917 (in contrast to the law applicable to other types of districts, providing that a director of the St. Francis Levee District must have owned for at least a year and must continue to own at least forty acres of taxable property in the district).
 (k) Some land in Crittenden County is not in the St. Francis Levee District; can only deeded landowners within the district vote?
In my opinion, the answer to this question is "yes." Section 7 ofAct 117 of 1917 provides that "[a]ll residents of the county owning real estate in the St. Francis Levee district" are entitled to vote. In order to vote, then, one must (1) own property within the district; and (2) live anywhere in the county, regardless of whether one's residence is in the district. Act 117 clearly prohibits a county resident from voting if he does not also own property located within the district.
 (l) If 20 people are listed as owning one piece of property within the Levee District, can all 20 people vote?
For the reasons set forth in my response to question 3(b), I believe the answer to this question is "yes." In my opinion, Act 117 envisions that the county-resident owner or owners of property contained within the district will be entitled to one vote each. Accordingly, if twenty people own one piece of property, they should all be allowed to vote.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB/JHD:cyh
[1] Act 19 of 1893 predated the adoption in 1926 of Ark. Const. amend.14, which prohibits local legislation. See Benton v. Thompson,187 Ark. 208, 211-12, 58 S.W.2d 924 (1933) (acknowledging that legislation enacted prior to the adoption of Amendment 14 remains valid and subject to repeal but not amendment). Moreover, as discussed in detail in Ark. Op. Att'y Gen. No. 2003-071, certain types of reasonable legislation applying to less than the whole state are still permitted under the constitution.
[2] Section 1973b(f)(2) extends the guarantees of § 1973 to members of language minority groups.
[3] Section 5 of the Voting Rights Act is codified at42 U.S.C. § 1973b.